**Joseph D. Zopolsky** *(Pro Hac Vice Pending)*
jzopolsky@gpm-law.com
**James C. Erdle, Jr.** *(Pro Hac Vice Pending)*
jerdle@gpm-law.com
**Meredith B. Gerber** *(Pro Hac Vice Pending)*
mgerber@gpm-law.com
**GLAST, PHILLIPS & MURRAY, P.C.**
14801 Quorum Drive, Suite 500
Dallas, Texas 75254
Telephone: (972) 419-8300
Facsimile: (972) 419-8329

Attorneys for Plaintiff
GENETIC TECHNOLOGICAL INNOVATIONS, LLC

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| GENETIC TECHNOLOGICAL INNOVATIONS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER MYERS,<br><br>Defendant. | Case No.: _____<br><br>**ORIGINAL COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Genetic Technological Innovations, LLC ("Plaintiff" or "GTI") files its Original Complaint ("Complaint") complaining of Defendant Christopher Myers ("Defendant" or "Myers"), as follows:

## I.    PARTIES

1.    Plaintiff Genetic Technological Innovations, LLC is a Delaware limited liability company with its principal place of business and mailing address at 14500 N. Northsight Blvd., Suite 100, Scottsdale, Arizona 85260.  Consequently, GTI is a citizen of Delaware and Arizona for purposes of diversity.

2.    On information and belief, Defendant Christopher Myers is an adult individual who is a citizen of California, residing in Los Angeles County, California,

with a mailing address at 4215 Glencoe Ave., Unit 121, Marina Del Rey, California, 90292.  Consequently, Myers is a citizen of California for purposes of diversity.

## II.    JURISDICTION & VENUE

3.    Complete diversity of citizenship exists and the amount in controversy exceeds $75,000.  Subject matter jurisdiction over Plaintiff's state and common law claims is proper pursuant to 28 U.S.C. § 1332.

4.    Venue in the United States District Court for the District of Arizona is proper under 28 U.S.C. § 1391(b).

5.    This Court has personal jurisdiction over Defendant Chris Myers because he committed acts within this State in violation of Plaintiff's rights under Arizona law.  Further, Defendant has continuous and systematic contacts with Arizona, and/or he has purposefully availed himself of the privilege of conducting business in Arizona and the allegations in this Complaint arise out of and relate to his forum-related activities.

## III.   FACTS

6.    Christopher Myers is the founder and owner of a company called Hermes Health Labs, LLC ("Hermes").

7.    On April 6, 2023, GTI and Hermes entered into an agreement in which GTI agreed to extend a line of credit in the amount of $500,000.00 to Hermes (the "Loan Agreement").  A copy of the Loan Agreement is attached as Exhibit A.

8.    On April 6, 2023, GTI and Hermes also executed a Revolving Promissory Note (the "Promissory Note") in which Hermes agreed to a payment schedule for all amounts Hermes borrowed, including interest, under the Loan Agreement.  A copy of the Promissory Note is attached as Exhibit B.

9.    On April 3, 2023, Christopher Myers executed a personal guaranty (the "Guaranty") in which he agreed to guarantee all of Hermes' indebtedness related to the Loan Agreement and the Promissory Note.  A copy of the Guaranty is attached as Exhibit C.

10.    Under the terms of the Guaranty, Myers agreed that GTI could seek enforcement of the guaranty in a suit such as this action:

> 9.    **Enforcement of Guaranty**.  Guarantors agree that Payee shall not be first required to enforce against Maker or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against any one or more of the Guarantors. Suit may be brought and maintained against Guarantors by Payee to enforce any liability, obligation or duty guaranteed hereby without joinder of Maker or any other party or without Payee first exhausting Payee's remedies against Maker or without Payee first exhausting Payee's rights against any security which shall ever have been given to Payee to secure the payment or performance of the Guaranteed Obligations.

Exhibit C, Section 9.

11.    Under the terms of the Loan Agreement, Hermes was allowed to borrow and repay advances against the line of credit during the period beginning April 3, 2023 and ending March 31, 2024, subject to certain conditions.  The Loan Agreement allowed Hermes to draw up to $500,000.00 as outlined below:

> Section 3 – Line of Credit:  Subject to the terms and conditions of this Agreement and the Note, during the period beginning April 3, 2023 and continuing until March 31, 2024, so long as this Agreement is not terminated pursuant to Section 5, Borrower may borrow, repay, and reborrow Advances as Borrower may from time to time request from Lender up to and including the Maximum Drawable Amount, but such Advances in the aggregate at any one time outstanding shall not exceed the amount of the Maximum Drawable Amount.  Notwithstanding the foregoing, the maximum Advance that may be drawn during the first twenty-one (21) days this Agreement is in effect is One Hundred Seventy-Five Thousand Dollars ($175,000.00). The maximum Advance that may be drawn during each of the second and third twenty-one (21) day period from the effective date is One Hundred Seventy-Five Thousand Dollars ($175,000.00) during each such period. Renewal of this Loan Agreement shall be at the Lender's sole discretion.

Exhibit A, Section 3.

12.    Under the terms of the Promissory Note, Hermes agreed to make payments to GTI pursuant to the following schedule:

1

2

3

4

5

6

7

8

9

10

11

> Section 2 – Payment Terms:  For value received, Borrower promises to pay Lender on March 31, 2024, the maturity date hereof, the aggregate unpaid principal sum of all Advances made by Lender to Borrower hereunder and not theretofore repaid, together with outstanding interest accruing on all advances of principle from the date such principle is received by Borrower until the date such principle is repaid to Lender thereon at the rates and on the terms as hereinafter provided. Borrower further promises to pay, without set-off or deduction to the order of the Lender commencing on the first day of each calendar month starting May 1, 2023 and continuing for an initial period of three (3) months, as hereinbefore provided, or until the date of acceleration, as hereinafter provided, whichever shall first occur, annual interest on the principal sum from time to time in effect which is at the annual interest rate of twelve percent (12%).  Commencing with August 1, 2023, Borrower shall repay to Lender in monthly installments the outstanding principal balance of the Advances plus interest, with each such payment in an amount equal to the aggregate principal amount of the then-current outstanding Advances as of the applicable payment date divided by nine (9).  Principal and interest shall be payable at 14500 N. Northsight Blvd., Suite 100, Scottsdale, AZ 85260.  .  This Note evidences indebtedness incurred under, and is secured as provided in, that certain Loan Agreement between Lender and Borrower dated as of April 3, 2023 and any and all amendments thereto.  All terms, conditions, covenants, provisions and stipulations contained in the Loan Agreement are hereby incorporated herein.

12   Exhibit B, Section 2.

13      13.      Further, the parties executed a security agreement, in which Hermes

14   identified certain collateral, including accounts, inventory and machinery, to secure

15   any debt Hermes incurred under the Loan Agreement (the "Security Agreement").

16   A copy of the Security Agreement is attached as Exhibit D.

17      14.      Under the terms of the Promissory Note, if any payment due under the

18   schedule in Section 2 remained unpaid for thirty days, the entire outstanding

19   principal amount and accrued interest became due immediately at GTI's option. *See*

20   Exhibit B, Section 3.

21      15.      The Loan Agreement included several situations in which an event of

22   default could occur, including "[f]ailure by Borrower to submit any payment under

23   the Note by thirty (30) days after such payment is due pursuant to the terms and

24   conditions of the Note." *See* Exhibit A, Section 4(6).

25      16.      Upon any event of default, including that described in Section 4(6), GTI

26   had the option to immediately declare the Loan Agreement terminated and demand

27   that Hermes pay all principle and interest due and payable to GTI. *See id.*, Section

28   5.

17.    After executing the Loan Agreement, Promissory Note and Guaranty, Hermes borrowed the maximum allowed amount of $550,000.00.[1]

18.    Hermes has only made one interest payment under the terms of either the Loan Agreement or the Promissory Note: $4,000.00 on May 26, 2023.  Hermes has made no other payments towards the interest or the principal.

19.    On September 25, 2023, GTI sent notice pursuant to the terms of the agreements of Hermes' default.  *See* Exhibit E.  GTI notified Hermes that it had failed to make the agreed upon payments for the moths of July, August and September of 2023.  *See id*.  As it was allowed to do under the terms of the agreements, GTI demanded the full balance of the loan, which was $566,000.00 on that date.  *See id*.

20.    Based on the terms of the Loan Agreement, the entire principal amount of the loan plus interest are due immediately.

21.    Based on the terms of the Guaranty, Christopher Myers is liable for the entire amount that Hermes owes.

22.    As of March 1, 2024, the outstanding balance owed to GTI pursuant to the agreements is $598,269.71.

## IV.    CAUSES OF ACTION

### COUNT 1
### BREACH OF CONTRACT

23.    GTI alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

24.    The Loan Agreement, the Promissory Note and the Guaranty are valid contracts.

25.    Hermes breached the Loan Agreement and the Promissory Note by failing to pay GTI the amounts it owes.

---

[1] After executing the agreements, GTI agreed to increase the maximum allowed amount from $500,000.00 to $550,000.00.

26.    Myers, as the guarantor on each contract, breached the Guaranty by failing to pay GTI the amounts Hermes owes as he promised to do pursuant to the Guaranty.  Defendant's failures caused GTI damages, as stated above.

27.    All conditions precedent to this claim have been performed or have occurred.

## COUNT 2
### ATTORNEYS' FEES

28.    GTI is entitled to recover reasonable and necessary attorney fees under Section B(2) of the Security Agreement, Section 10 of the Guaranty and A.R.S. § 12.341.01.

## V.    JURY DEMAND

29.    GTI hereby demands a trial by jury and tenders the appropriate fee to the Court.

## VI.    PRAYER

Genetic Technological Innovations, LLC, prays that the Court:

1.    Award GTI damages for Defendant's breaches of the Agreements, in the amount of at least $598,269.71;

2.    Award GTI any other monetary damages in an amount according to proof at trial;

3.    Award GTI its interest in an amount according to proof at trial;

4.    Award GTI its attorneys' fees and costs incurred with litigating this lawsuit pursuant to the Agreements and to A.R.S. § 12.341.01; and

5.    Award GTI any other relief that this Court deems just and proper.

DATED: April 12, 2024

BY: /s/ James C. Erdle, Jr.

**Joseph D. Zopolsky** *(Pro Hac Vice Pending)*
jzopolsky@gpm-law.com
**James C. Erdle, Jr.** *(Pro Hac Vice Pending)*
jerdle@gpm-law.com
**Meredith B. Gerber** *(Pro Hac Vice Pending)*
mgerber@gpm-law.com
**GLAST, PHILLIPS & MURRAY, P.C.**
14801 Quorum Drive, Suite 500
Dallas, Texas 75254
Telephone: (972) 419-8300
Facsimile: (972) 419-8329

Attorneys for Plaintiff
GENETIC TECHNOLOGICAL
INNOVATIONS, LLC

# Exhibit A

<u>REVOLVING LOAN AGREEMENT</u>

THIS REVOLVING LOAN AGREEMENT ("Agreement") is made by and between Genetic Technological Innovations, LLC ("Lender") and Hermes Health Labs LLC ("Borrower").

W I T N E S S E T H

WHEREAS, Borrower desires to obtain line of credit in the amount of Five Hundred Thousand Dollars ($500,000.00) from Lender; and

WHEREAS, Lender desires to extend a line of credit in the amount of Five Hundred Thousand Dollars ($500,000.00) to Borrower on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and benefits set forth below, Borrower and Lender hereby agree as follows:

TERMS AND CONDITIONS

<u>Section 1 – Recitals:</u>  The identification of parties and recitals set forth above are true and correct.

<u>Section 2 – Definitions:</u>  The following definitions shall apply:

(1)     <u>Advances:</u>  The term "Advances" shall mean such amounts Borrower will from time to time draw under the line of credit established pursuant to this Agreement.

(2)     <u>Event of Default:</u>  The term "Event of Default" shall mean any one of the events enumerated in Section 4.

(3)     <u>Maximum Drawable Amount:</u>  The term "Maximum Drawable Amount" shall mean Five Hundred Thousand Dollars ($500,000.00).

(4)     <u>Note:</u>  The term "Note" shall mean that certain Revolving Credit Promissory Note by and between Lender and Borrower attached hereto as <u>Exhibit 1</u> and by this reference incorporated herein, as the same may from time to time, be amended and/or supplemented.

<u>Section 3 – Line of Credit:</u>  Subject to the terms and conditions of this Agreement and the Note, during the period beginning April 3, 2023 and continuing until March 31, 2024, so long as this Agreement is not terminated pursuant to Section 5, Borrower may borrow, repay, and reborrow Advances as Borrower may from time to time request from Lender up to and including the Maximum Drawable Amount, but such Advances in the aggregate at any one time outstanding shall not exceed the amount of the Maximum Drawable Amount.  Notwithstanding the foregoing, the maximum Advance that may be drawn during the first twenty-one (21) days this Agreement is in effect is One Hundred Seventy-Five Thousand Dollars ($175,000.00). The maximum Advance that may be drawn during each of the second and third twenty-one (21) day period from the effective date is One Hundred Seventy-Five Thousand Dollars ($175,000.00) during each such period. Renewal of this Loan Agreement shall be at the Lender's sole discretion.

Section 4 – Events of Default:  The following occurrences shall be deemed Events of Default:

(1)    Borrower makes an assignment for the benefit of its creditors, becomes insolvent or admits in writing its inability to pay its debts as they become due.

(2)    Borrower files a voluntary petition in bankruptcy or files a petition or answer seeking for itself reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future statute, law or regulation.

(3)    Borrower files an answer admitting or not contesting the material allegations of any petition filed in any action commenced against Borrower in bankruptcy or seeking the relief described in Section 4(2), or any such action shall not have been dismissed within thirty (30) days after it is commenced.

(4)    Borrower, or any of its directors, officers, or shareholders, takes any action looking to the dissolution or liquidation of Borrower.

(5)    Borrower applies for, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator and is appointed and is not discharged within thirty days (30).

(6)    Failure by Borrower to submit any payment under the Note by thirty (30) days after such payment is due pursuant to the terms and conditions of the Note.

(7)    Borrower breaches the Management Services Agreement ("MSA") of even date herewith between Lender and Borrower and does not properly cure this breach pursuant to the terms thereof and/or in the event of the termination of the MSA.

Section 5 – Termination:  Should one or more of the Events of Default occur, Lender, at its option, may immediately declare this Agreement terminated, may terminate any obligation that Lender has under this Agreement or otherwise to make any further Advances to or for the benefit of Borrower, and may declare that the principle of, and interest on, the Note shall immediately be due and payable upon the written request of Lender.

Section 6 -- Security Interest:  The payment of the indebtedness evidenced by this Note is secured by a) Borrower's pledge to Lender of certain of its equipment and accounts receivables pursuant to that certain Security Agreement attached hereto as Exhibit 2 and incorporated herein by this reference (the "Security Agreement") and b) the guaranty of ___Chris Myers___ (each a "Guarantor" and, collectively, the "Guarantors") pursuant to that certain Guaranty Agreement attached hereto as Exhibit 3 and incorporated herein by this reference (the "Guaranty Agreement").

Section 7 – Financing Statement:  At Lender's request, Borrower shall execute and/or join with Lender in executing one or more financing statements in a form satisfactory to the Lender and will pay the costs of filing or recording the same or this Agreement in all public offices deemed necessary or advisable by Lender.

Section 8 – Information:  Borrower will, at such times as Lender may request, deliver to Lender such schedules, certificates, and reports respecting all or any of the assets of Borrower which at the time is subject to the security interest granted in this Agreement and such additional schedules, certificates, and reports respecting the items or amounts received by Borrower in full or partial payment or otherwise as proceeds of all or any of the assets of the Borrower, as Lender may request.  Any such schedule, certificate or report shall be executed by the President of Borrower and shall be in such form and detail as Lender may specify.  Borrower will at all reasonable times allow Lender or its representatives free and complete access to all of Borrower's records related to this transaction, for such inspection and examination as Lender shall reasonably require.

Section 9 -- Governing Law:  This Agreement shall be governed by the laws of the State of Arizona without regard to any rules of conflict or choice of laws which require the application of laws of another jurisdiction and venue shall be in Maricopa County, Arizona.

Section 10 -- Notice:  All communications shall be in writing and shall be delivered by Certified Mail to the address set forth below for each respective party:

Lender                                         Address
Genetic Technological Innovations, LLC         14500 N. Northsight Blvd.
                                               Suite 100
                                               Scottsdale, AZ 85260

Borrower                                       Address
Hermes Health Labs, LLC                        9375 East Shea Boulevard
                                               Suite 100
                                               Scottsdale, Arizona 85260

Notice shall be effective upon receipt as evidenced by return receipt.

Section 11 -- Waiver:  Waiver of a breach under this Agreement shall not constitute waiver of another breach.  Failure to enforce a provision of this Agreement shall not constitute waiver or create an estoppel from enforcing such provision.

Section 12 -- Assignments:  All assignments of rights hereunder by either party shall be void.

IN WITNESS WHEREOF, this Agreement shall be effective as of the date the Agreement is signed by both parties, whichever is later.

BORROWER:

Hermes Health

By: _____

Print name: _____
Chris Myers

Title: _____
Founder

Date: _____
4/5/2023

LENDER:

Genetic Techn_____ons, LLC

By: _____

Print Name: _____
Nick Glimcher

Title: _____
Ceo

Date: _____
4/6/2023

# Exhibit B

EXHIBIT 1

REVOLVING PROMISSORY NOTE

THIS REVOLVING PROMISSORY NOTE ("Note") is made by and between Genetic Technological Innovations, LLC("Lender") and Hermes Health Labs, LLC(Borrower").

W I T N E S S E T H

WHEREAS, Lender desires to be reimbursed by Borrower for loans made pursuant to a line of credit in the amount of Five Hundred Thousand Dollars ($500,000.00); and

WHEREAS, Borrower desires to reimburse Lender for loans made pursuant to a line of credit in the amount of Five Hundred Thousand Dollars ($500,000.00); and

NOW, THEREFORE, in consideration of the mutual covenants and benefits set forth below, Borrower and Lender hereby agree as follows:

TERMS AND CONDITIONS

Section 1 – Recitals:  The identification of parties and recitals set forth above are true and correct.

Section 2 – Payment Terms:  For value received, Borrower promises to pay Lender on March 31, 2024, the maturity date hereof, the aggregate unpaid principal sum of all Advances made by Lender to Borrower hereunder and not theretofore repaid, together with outstanding interest accruing on all advances of principle from the date such principle is received by Borrower until the date such principle is repaid to Lender thereon at the rates and on the terms as hereinafter provided. Borrower further promises to pay, without set-off or deduction to the order of the Lender commencing on the first day of each calendar month starting May 1, 2023 and continuing for an initial period of three (3) months, as hereinbefore provided, or until the date of acceleration, as hereinafter provided, whichever shall first occur, annual interest on the principal sum from time to time in effect which is at the annual interest rate of twelve percent (12%).  Commencing with August 1, 2023, Borrower shall repay to Lender in monthly installments the outstanding principal balance of the Advances plus interest, with each such payment in an amount equal to the aggregate principal amount of the then-current outstanding Advances as of the applicable payment date divided by nine (9). Principal and interest shall be payable at 14500 N. Northsight Blvd., Suite 100, Scottsdale, AZ 85260.  .  This Note evidences indebtedness incurred under, and is secured as provided in, that certain Loan Agreement between Lender and Borrower dated as of April 3, 2023 and any and all amendments thereto.  All terms, conditions, covenants, provisions and stipulations contained in the Loan Agreement are hereby incorporated herein.

Section 3 – Late Payment:      Notwithstanding anything to the contrary in this Note, if any payment due under this Note is not paid when due and remains unpaid for thirty (30) days, the entire principal amount outstanding and accrued interest thereon shall at once become due and payable at the option of the Note holder.

<u>Section 4 – Prepayment:</u>  Borrower may prepay the principal or interest amount outstanding in whole or in part.  Any partial prepayment shall be applied against the amount outstanding and shall not postpone the due date of any subsequent monthly installments or change the amount of such installments unless Lender shall otherwise agree in writing.  Any repayment, whether by prepayment or otherwise, which shall be received by Lender on a day which is not a Banking Day shall be deemed received on the first Banking Day thereafter.  The term "Banking Day" shall mean a day upon which the general banking offices of Lender are open for business between 9:00 a.m. and 4:00 p.m.

IN WITNESS WHEREOF, this Agreement has been executed as of the date the Agreement is signed by both parties, whichever is later.

BORROWER:

Hermes Health

By: _____

*DocuSigned by:*
*Chris Myers*
8F961F2D0C87458...

Print name: _____
Chris Myers

Title: _____
Founder

Date: _____
4/5/2023


LENDER:

Genetic Techno_____s, LLC

By: _____

*DocuSigned by:*
*Nick Glimcher*
E1784EC018514FE...

Print name: _____
Nick Glimcher

Title: _____
Ceo

Date: _____
4/6/2023

# Exhibit C

EXHIBIT 3

GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (the "**Guaranty**") is made by the undersigned, Chris Myers, an individual resident of ___Arazona___, Hermes Health Holdco, LLC, and Hermes Health Sciences, LLC (each a "**Guarantor**" and, collectively, the "**Guarantors**"), as of the 3rd day of April, 2023.

**W I T N E S S E T H**:

WHEREAS, on even date herewith Hermes Health Labs, LLC (the "**Maker**") executed and delivered that certain Revolving Loan Agreement (the "**Agreement**") and Revolving Promissory Note (the "**Note**") to Genetic Technological Innovations, LLC (the "**Payee**"), evidencing Maker's indebtedness to Payee in the principal sum of Five Hundred Thousand and No/100 Dollars ($500,000.00), and Maker agreed to repay said amount in accordance with the terms and conditions set forth in the Note; and

WHEREAS, as a material inducement to Payee to loan and advance the principal sum evidenced by the Note to Maker, Guarantors agreed to jointly and severally guarantee the payment of the indebtedness evidenced by the Agreement, Note, and Security Agreement and the performance of the obligations of Maker under the Agreement, the Note, and the Security Agreement pursuant to the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, Guarantors hereby agree as follows:

1. **Guarantee of Maker's Obligations**.  Guarantors, as primary obligor and not merely as surety and intending to be legally bound hereby, hereby absolutely, irrevocably, unequivocally and unconditionally, jointly and several guarantee to Payee the due, prompt and faithful performance of, compliance with and execution of all of the terms, provisions, conditions, covenants, warranties, obligations and agreements of Maker contained in, described in or pursuant to the Agreement, the Note, the Security Agreement and this Guaranty, including the prompt and full payment of all indebtedness of Maker to Payee arising pursuant to the Note and all renewals and extensions thereof, now existing or hereafter arising pursuant to the Note (the "**Guaranteed Obligations**"). In the event of default by Maker in payment or performance of the indebtedness evidenced by the Note, or any part thereof, when such indebtedness or other obligations become due, whether by maturity, scheduled payment or by acceleration, Guarantors shall, on demand and without further notice of dishonor, pay the amount due thereon to Payee.  In the event of such payment is made by Guarantors, then Guarantors shall be subrogated to the rights then held by Payee with respect to the Guaranteed Obligations to the extent to which the Guaranteed Obligations were discharged by Guarantor. Upon payment by Guarantors of any sums to Payee hereunder, all rights of Guarantors against Maker arising as a result therefrom by way of right of subrogation or otherwise, shall in

DocuSign Envelope ID: C27EA5B8-C63D-4FBE-A39D-18E5F5670E89

all respects be subordinate and junior in right of payment to the prior indefeasible payment in full of all the obligations of Maker to Payee under the Note. This Guaranty shall be irrevocable by Guarantors until all of the Guaranteed Obligations have been finally, completely and indefeasibly paid in full and completely performed.

2. **Nondischargeability of Guaranty**.  Guarantors hereby agree that Guarantors' obligations under the terms of this Guaranty shall not be released, diminished, impaired, modified, affected or limited in any manner whatsoever by the occurrence of any reason or event, including without limitation, one or more of the following events:  (a) the taking or accepting of any other security for any or all of the Guaranteed Obligations; (b) any indulgence, compromise, settlement or release which may be extended by Payee to Maker, Guarantors or any one or more other parties liable in whole or in part for the Guaranteed Obligations  for such consideration as Payee may deem proper; (c) the lack of limited liability company power of Maker, the insolvency or bankruptcy of Maker, or any party at any time liable for the payment of any or all of the Guaranteed Obligations, whether now existing or hereafter occurring; (d) any renewal, extension, and/or rearrangement of the payment of any or all of the Guaranteed Obligations with or without notice to or consent of Guarantors; (e) any neglect, delay, omissions, failure, or refusal of Payee to take or prosecute any action for the collection of any of the Guaranteed Obligations or to foreclose or take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations; (f) the enforceability of all or any part of the Guaranteed Obligations against Maker by reason of the fact that the Guaranteed Obligations exceed the amount permitted by law, the act of creating the Guaranteed Obligations, or any part thereof, is ultra vires, or the officers creating same acted in excess of their authority; (g) any payment by Maker to Payee is held to constitute a preference under the bankruptcy laws or if for any other reason Payee is required to refund such payment or pay the amount thereof to someone else; or (h) any impairment, modification, change, release or limitation of the liability of Maker or Guarantors, or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the Federal Bankruptcy Code or any similar law or statute of the United States or the State of Arizona.

3. **No Setoff**.  The obligations, guaranties, covenants, agreements and duties of Guarantors under this Guaranty are primary obligations of Guarantors and shall not be subject to any counterclaim, setoff, deduction, diminution, abatement, recoupment, suspension, deferment, reduction or defense based upon any claim that Maker, Guarantors or any other person or entity may have against Payee.  The obligations of Guarantors set forth herein constitute recourse obligations of Guarantors enforceable against Guarantors to the full extent of Guarantors' assets and properties.

4. **Continuation of Guaranty**.  Guarantors covenant that this Guaranty will not be discharged except by complete performance of the Guaranteed Obligations contained in this Guaranty. This Guaranty shall not be affected by, and shall remain in full force and effect notwithstanding, any bankruptcy, insolvency, liquidation, or reorganization of Maker.

5. **Reliance on Guaranty**.  Guarantors recognize that Payee is relying upon this Guaranty and the undertakings of Guarantors hereunder in accepting the Note, and Guarantors further recognize that the execution and delivery of this Guaranty is a material inducement to Payee in entering into the Note and agreeing to extend the loan to Maker in accordance with the terms of the Note.

6. **Payments under Guaranty**.  All amounts to be payable under this Guaranty shall be payable at the address of Payee set forth in the Note or at such other address as Payee may from time to time designate in writing.

7. **Representations of Guarantors**.  Guarantors hereby represent, warrant and covenants to Payee as follows:

    a.  **Authorization**.  Guarantors have all requisite power and authority to execute, deliver and perform this Guaranty.  The Guaranty constitutes the valid and binding obligation of Guarantors, enforceable against Guarantors in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium, reorganization or other laws or equitable principles relating to or affecting creditors' rights generally.

    b.  **Benefit to Guarantors**.  Guarantors have derived, or expect to derive, financial and other advantage and benefit, directly or indirectly, from the consummation of the transactions contemplated by the Note and the making of this Guaranty.

8. **Waiver**.  Guarantors hereby waive notice to Guarantors of the acceptance of this Guaranty, and of any default on the part of Maker of Maker's obligations under the Note to Payee, and all other notices in connection herewith or in connection with the liabilities, obligations and duties guaranteed hereby.  Guarantors further waive diligence, presentment and suit on part of Payee in the enforcement of any liability, obligation or duty guaranteed by Guarantors hereunder.

9. **Enforcement of Guaranty**.  Guarantors agree that Payee shall not be first required to enforce against Maker or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against any one or more of the Guarantors. Suit may be brought and maintained against Guarantors by Payee to enforce any liability, obligation or duty guaranteed hereby without joinder of Maker or any other party or without Payee first exhausting Payee's remedies against Maker or without Payee first exhausting Payee's rights against any security which shall ever have been given to Payee to secure the payment or performance of the Guaranteed Obligations.

10. **Payment of Expenses and Attorneys' Fees.**  Guarantors agree to pay, on demand, and to save Payee harmless against liability for, any and all costs and expenses (including reasonable fees and disbursements of counsel) incurred or expended by Payee in connection with the enforcement of or preservation of any rights under this Guaranty.

11. **Governing Law**.  THIS GUARANTY IS MADE, ENTERED INTO AND PERFORMABLE IN MARICOPA COUNTY, ARIZONA, AND ALL PAYMENTS ARE DUE AND PAYABLE IN MARICOPA COUNTY, ARIZONA. CONSEQUENTLY, THIS GUARANTY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ARIZONA WITHOUT REGARD TO ITS CONFLICTS OF LAW RULES AND ANY LITIGATION OR OTHER PROCEEDING AS BETWEEN GUARANTOR AND PAYEE THAT MAY BE BROUGHT, OR ARISE OUT OF, IN CONNECTION WITH OR BY REASON OF THIS GUARANTY SHALL BE BROUGHT IN THE APPLICABLE FEDERAL OR STATE COURT IN AND FOR MARICOPA COUNTY, ARIZONA WHICH COURTS SHALL BE THE EXCLUSIVE COURTS OF JURISDICTION AND VENUE.

12. **Termination of Guaranty**.  This Guaranty shall terminate and be of no further force or effect upon the payment of the Guaranteed Obligations in full.

13. **Reformation and Severability**.  If any provision of this Guaranty is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof (i) in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Guaranty a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable, and (ii) the legality, validity and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

14. **Successors and Assigns**.  This Guaranty shall be binding upon and inure to the benefit of Guarantors and Payee and their respective heirs, personal representatives, successors and permitted assigns.  Guarantors may not assign or transfer any of Guarantors' rights or obligations hereunder without the prior written consent of Payee.  In the event of an assignment by Payee of its rights or interest in the Guaranteed Obligations including the Note, or any part thereof, the rights and benefits hereunder, to the extent applicable to the indebtedness so assigned shall automatically pass with a transfer or assignment of the Note or any interest therein to any holder thereof.

15. **Entire Agreemen**t.  This Guaranty embodies the final, entire agreement of Guarantors and Payee with respect to the subject matter hereof and supersedes any and all prior or contemporaneous agreements, representations and understandings, whether written or oral, relating to this.

IN WITNESS WHEREOF, Guarantors have executed this Guaranty as of the date first above written.

**GUARANTORS**:

Chris Myers
Chris Myers


**Hermes Health Holdco, LLC**

By: _____

Print name: _____
                  Chris Myers

Title: _____
                  Founder

Date: _____
                  4/5/2023


**Hermes Health Sciences, LLC**

By: _____

Print name: _____
                  Nick Glimcher

Title: _____
                  Ceo

Date: _____
                  4/6/2023

# Exhibit D

EXHIBIT 2

SECURITY AGREEMENT

Date:                                                  April 3, 2023

Debtor:                                                Hermes Health Labs, LLC

Debtor's Mailing Address:                              9375 East Shea Boulevard
                                                       Suite 100
                                                       Scottsdale, Arizona 85260

Secured Party:                                         Genetic Technological Innovations, LLC

Secured Party's Mailing Address                        14500 N. Northsight Blvd.
[include county]                                       Suite 100
                                                       Scottsdale, AZ 85260 (Maricopa County)

Classification of Collateral:                          Accounts and equipment

Collateral:                                            All present and future accounts, non-Medicare
                                                       and Medicaid accounts receivable, contract
                                                       rights, general intangibles, including but not
                                                       limited to records, instruments, chattel paper,
                                                       tax refunds, and including without limitation
                                                       any and all purchase orders, instruments, and
                                                       other documents evidencing obligations for
                                                       goods sold or leased and/or services rendered by
                                                       Debtor.

                                                       All inventory of every nature and description
                                                       belonging to Debtor wherever located and
                                                       whether now owned or in existence or hereafter
                                                       acquired, and including without limitation all
                                                       raw materials and supplies used or consumed in
                                                       Debtor's business; working in process, finished
                                                       goods, and in all returns or refunds (applicable
                                                       thereto), and the right to collect the same.

                                                       Any and all present and future removable
                                                       leasehold improvements, machinery,
                                                       equipment, furniture, fixtures, tools,
                                                       attachments, now owned or hereafter acquired,
                                                       wherever located, and in any additions and
                                                       accessions thereto, substitutions therefore,

Page 7

replacements thereof, and in the proceeds of any of the foregoing.

All proceeds of any of the above, including but not limited to insurance proceeds.

Obligation:

Note:

| | |
|---|---|
| Date: | April 3,2023 |
| Original principal amount: | $500,000.00 |
| Borrower (Obligor): | Hermes Health Labs, LLC |
| Lender (Secured Party): | Genetic Technological Innovations, LLC |
| Terms of payment: | As set forth in the Note |
| Other debt/Future advances: | The security interest also secures all other present and future debts and liabilities of Debtor and/or Obligor to Secured Party, including future advances. |
| Other obligation[s]: | None |

**Debtor's Representations Concerning Debtor and Locations:**

The chattel paper collateral is located solely at Debtor's office at 9375 East Shea Boulevard, Suite 100, Scottsdale, Arizona 85260.

Debtor's state of organization is Delaware; Debtor's name, as shown in its organizational documents, as amended, is exactly as set forth above; and Debtor's organizational identification number is 7100542.

Debtor's records concerning the Collateral are located at Debtor's office at 9375 East Shea Boulevard, Suite 100, Scottsdale, Arizona 85260.

Debtor grants to Secured Party a security interest in the Collateral and all its proceeds to secure the Obligation and all renewals, modifications, and extensions of the Obligation. Debtor authorizes Secured Party to file a financing statement describing the Collateral.

**A.    Debtor represents and warrants the following:**

1.    No financing statement covering the Collateral is filed in any public office.

2.    Debtor owns the Collateral and has the authority to grant this security interest, free from any setoff, claim, restriction, security interest, or encumbrance except liens for taxes not yet due.

3.    All information about Debtor's financial condition is or will be accurate when provided to Secured Party.

4.    Each account and chattel paper in the Collateral is and will be the valid, legally enforceable obligation of a third-party account debtor or obligor.

5.    If any Collateral or proceeds include obligations of third parties to Debtor, the transactions creating those obligations conform and will conform in all respects to applicable state and federal consumer credit law.

**B.    Debtor agrees to:**

1.    Defend the Collateral against all claims adverse to Secured Party's interest; keep the Collateral free from liens, except for liens in favor of Secured Party or for taxes not yet due; and keep the Collateral in Debtor's possession and ownership except as otherwise provided in this agreement.

2.    Pay all Secured Party's expenses, including reasonable attorney's fees, incurred to obtain, preserve, perfect, defend, and enforce this agreement or the Collateral and to collect or enforce the Obligation. These expenses will bear interest from the date of advance at the rate stated in the Note for matured, unpaid amounts and are payable on demand at the place where the Obligation is payable. These expenses and interest are part of the Obligation and are secured by this agreement.

3.    Sign and deliver to Secured Party any documents or instruments that Secured Party considers necessary to obtain, maintain, and perfect this security interest in the Collateral.

4.    Notify Secured Party immediately of any event of default and of any material change (a) in the Collateral, (b) in Debtor's Mailing Address, (c) in the location of any Collateral, (d) in any other representation or warranty in this agreement, and (e) that may affect this security interest, and of any change (f) in Debtor's name and (g) of any location set forth above to another state.

5.    Use the Collateral primarily according to the stated classification.

6.    Maintain accurate records of the Collateral at the address set forth above; furnish Secured Party any requested information related to the Collateral; and permit Secured Party to inspect and copy all records relating to the Collateral.

7.      Preserve the liability of all obligors on the Collateral and preserve the priority of all security for the Collateral.

8.      On Secured Party's demand after default by Debtor, hold payments, including instruments, items, and money received as proceeds of the Collateral, separate and in an express trust for Secured Party and deposit all such payments received as proceeds of the Collateral in a special bank account designated by Secured Party, who alone will have power of withdrawal.

9.      Inform Secured Party immediately of a claim made in regard to any Collateral.

10.     Cause each chattel paper in the Collateral to have only one original counterpart and, at the request of Secured Party after default by Debtor, (a) immediately deliver to Secured Party all current and after-acquired chattel paper Collateral in Debtor's possession and either endorse it to Secured Party's order or give Secured Party appropriate executed powers, (b) obtain the acknowledgment of any other person in possession of chattel paper Collateral of Secured Party's security interest in the Collateral, or (c) mark each chattel paper in the Collateral with a legend indicating that it is subject to a security interest under this agreement.

**C.      Debtor agrees not to:**

1.      Sell, transfer, or encumber any of the Collateral, except in the ordinary course of Debtor's business or as permitted by this agreement.

2.      Change its name or jurisdiction of organization, merge or consolidate with any person, or convert to a different entity without notifying Secured Party in advance and taking action to continue the perfected status of the security interest in the Collateral.

**D.      Default and Remedies:**

1.      A default exists if:

a.      Debtor fails to timely pay or perform any obligation or covenant in any written agreement between Secured Party and Debtor;

b.      any warranty, covenant, or representation in this agreement or in any other written agreement between Secured Party and Debtor is materially false when made;

c.      a receiver is appointed for Debtor or any Collateral;

d.      any Collateral is assigned for the benefit of creditors;

e.      a bankruptcy or insolvency proceeding is commenced by Debtor;

    f.      a bankruptcy or insolvency proceeding is commenced against Debtor, and the proceeding continues without dismissal for 60 days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered;

    g.      Debtor is dissolved, begins to wind up its affairs, is authorized to dissolve or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the dissolution or winding up of the affairs of Debtor; or

    h.      Debtor is in default under the Obligation.

2.      If a default exists, but not prior thereto, Secured Party may:

    a.      demand, collect, convert, redeem, settle, compromise, receipt for, realize on, sue for, and adjust the Collateral either in Secured Party's or Debtor's name, as Secured Party desires, or take control of any proceeds of the Collateral and apply the proceeds against the Obligation;

    b.      take possession of any Collateral not already in Secured Party's possession, without demand or legal process, and for that purpose Debtor grants Secured Party the right to enter any premises where the Collateral may be located;

    c.      without taking possession, sell, lease, or otherwise dispose of the Collateral at any public or private sale in accordance with law;

    d.      exercise any rights and remedies granted by law or this agreement;

    e.      notify obligors on the Collateral to pay Secured Party directly and enforce Debtor's rights against such obligors; and

    f.      as Debtor's agent, make any endorsements in Debtor's name and on Debtor's behalf.

3.      Foreclosure of this security interest by suit does not limit Secured Party's remedies, including the right to sell the Collateral under the terms of this agreement. Secured Party may exercise all remedies at the same or different times, and no remedy is a defense to any other. Secured Party's rights and remedies include all those granted by law and those specified in this agreement.

4.      Secured Party's delay in exercising, partial exercise of, or failure to exercise any of its remedies or rights does not waive Secured Party's rights to subsequently exercise those remedies or rights. Secured Party's waiver of any default does not waive any other default by

Debtor. Secured Party's waiver of any right in this agreement or of any default is binding only if it is in writing. Secured Party may remedy any default without waiving it.

5.      At any time, Secured Party may contact obligors on the Collateral directly to verify information furnished by Debtor.

6.      Secured Party has no obligation to collect any of the Collateral and is not liable for failure to collect any of the Collateral, for failure to preserve any rights pertaining to the Collateral, or for any act or omission on the part of Secured Party or Secured Party's officers, agents, or employees, except willful misconduct.

7.      Secured Party has no obligation to satisfy the Obligation by attempting to collect the Obligation from any other person liable for it. Secured Party may release, modify, or waive any collateral provided by any other person to secure any of the Obligation. If Secured Party attempts to collect the Obligation from any other person liable for it or releases, modifies, or waives any collateral provided by any other person, that will not affect Secured Party's rights against Debtor. Debtor waives any right Debtor may have to require Secured Party to pursue any third person for any of the Obligation.

8.      If Secured Party must comply with any applicable state or federal law requirements in connection with a disposition of the Collateral, such compliance will not be considered to adversely affect the commercial reasonableness of a sale of the Collateral.

9.      Secured Party may sell the Collateral without giving any warranties as to the Collateral. Secured Party may specifically disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of a sale of the Collateral.

10.     If Secured Party sells any of the Collateral on credit, Debtor will be credited only with payments actually made by the purchaser and received by Secured Party for application to the indebtedness of the purchaser. If the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and Debtor will be credited with the proceeds of the sale.

11.     If Secured Party purchases any of the Collateral being sold, Secured Party may pay for the Collateral by crediting the purchase price against the Obligation.

12.     Secured Party has no obligation to marshal any assets in favor of Debtor or against or in payment of the Note, or any other obligation owed to Secured Party by Debtor or any other person.

13.     If the Collateral is sold after default, recitals in the bill of sale or transfer will be prima facie evidence of their truth and all prerequisites to the sale specified by this agreement and by law will be presumed satisfied.

## E.    General

1.    Notice is reasonable if it is mailed, postage prepaid, to Debtor at Debtor's Mailing Address at least ten days before any public sale or ten days before the time when the Collateral may be otherwise disposed of without further notice to Debtor.

2.    This security interest will neither affect nor be affected by any other security for any of the Obligation. Neither extensions of any of the Obligation nor releases of any of the Collateral will affect the priority or validity of this security interest.

3.    This agreement binds, benefits, and may be enforced by the successors in interest of Secured Party and will bind all persons who become bound as debtors to this agreement. Assignment of any part of the Obligation and Secured Party's delivery of any part of the Collateral will fully discharge Secured Party from responsibility for that part of the Collateral. If such an assignment is made, Debtor will render performance under this agreement to the assignee. Debtor waives and will not assert against any assignee any claims, defenses, or setoffs that Debtor could assert against Secured Party except defenses that cannot be waived. All representations, warranties, and obligations are joint and several as to each Debtor.

4.    This agreement may be amended only by an instrument in writing signed by Secured Party and Debtor.

5.    The unenforceability of any provision of this agreement will not affect the enforceability or validity of any other provision.

6.    This agreement will be construed according to Arizona law, without regard to choice-of-law rules of any jurisdiction. This agreement is to be performed in the county of Secured Party's Mailing Address.

7.    Interest on the Obligation secured by this agreement will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the Obligation or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the Obligation or, if the principal of the Obligation has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the Obligation.

8.    In no event may this Agreement create a lien otherwise prohibited by law.

9.    When the context requires, singular nouns and pronouns include the plural.

**DEBTOR:**

**Hermes Health Labs, LLC**

By: _____

Print name: _____

Title:_____

Date:_____

*Chris Myers*

Chris Myers

Founder

4/5/2023

# Exhibit E



**GTI**
GENETIC TECHNOLOGICAL INNOVATIONS

**NOTICE OF DEFAULT**

September 25, 2023

VIA CERTIFIED AND ELECTRONIC MAIL

Mr. Chris Myers, Founder
Hermes Health Labs, LLC
9375 East Shea Boulevard
Suite 100
Scottsdale, Arizona 85260

       Re:    Hermes Health Labs, LLC ("Hermes"); Revolving Loan Agreement with Genetic
                Technological Innovations, LLC ("Loan")

Mr. Myers - You are hereby notified that Hermes is in default under the terms of the Loan referenced above in that the installments due in July, August and September of 2023 have not been paid. As such, pursuant to Section 5 of the Loan and Section 3 of the associated Revolving Promissory Note, demand is hereby made for the full balance of the Loan in the amount of Five Hundred Sixty-Six Thousand Dollars ($566,000.00), inclusive of interest accrued to date.

If payment of the entire amount is not received on or before the 30th day of September 2023, legal proceedings shall be instituted against Hermes and the costs of collection and attorneys' fees shall be added to Hermes' account. In addition, Genetic Technological Innovations, LLC may avail itself of its rights under both the Security and Guaranty Agreements associated with the Loan.

Your prompt attention to this matter is anticipated.

Yours truly,

Genetic Technological Innovations, LLC
By: Nick Glimcher
Its: CEO

cc:    Blake L. Osborn, Esquire
       Dentons US LLP
       601 South Figueroa Street, Suite 2500
       Los Angeles, CA 90017-5704

       Matthew Lipton
       3115 Chapel Downs Dr.
       Dallas, Texas 75229

ARIZONA HEADQUARTERS     TOXICOLOGY LAB     PATHOLOGY LAB
14500 N. Northsight Blvd. | Suite 100   13402 N. Scottsdale Rd. | Suite B183   13402 N. Scottsdale Rd. | Suite B185
Scottsdale, AZ 85260     Scottsdale, AZ 85254     Scottsdale, AZ 85254